IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**GERARD LOUIS,**

    **Plaintiff,**

**v.**                                        **CIVIL ACTION NO. 5:08cv151**
                                                                     **(Judge Stamp)**

**WARDEN (Acting) RICARDO MARTINEZ,**
**UNIT MANAGER CHRIS GRINER,**
**LIEUTENANT VINCE CLEMENTS,**

    **Defendants,**

## REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* plaintiff initiated this case on September 29, 2008, by filing a civil rights complaint against the above-named defendants pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983 and authorized suits against federal employees in their individual capacities. On November 24, 2008, the plaintiff was granted permission to proceed as a pauper. The plaintiff paid his initial partial filing fee on December 8, 2008.

On April 20, 2009, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Summonses were issued that same day.

On August 13, 2009, the defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. A Roseboro Notice was issued on August 14, 2009. On October 9, 2009, the plaintiff filed a document styled "Motion in Opposition of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, which was docketed as a response.

Accordingly, this case is before the undersigned for a report and recommendation on the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment.

## II. The Complaint

During the time period relevant to this complaint, the plaintiff was incarcerated at USP Hazelton which is located in Bruceton Mills, West Virginia.[1] In his complaint, the plaintiff alleges that the defendants have violated his 8th Amendment rights by placing him in "an unsafe condition that posed an unreasonable risk of serious damage to [his] future health." (Doc. 1, p. 6). In addition, the plaintiff alleges that his constitutional right to be free of cruel and unusual punishment was violated. Finally, the plaintiff alleges that he was placed in an unsafe condition as retaliation for litigation he had filed against "top prison officials." (Doc. 1. p. 5).

The plaintiff elaborates on his claims by setting forth a chain of events beginning on February 7, 2007, when he indicates he had a disagreement with his cell mate, inmate X. More specifically, the plaintiff alleges that X assaulted him and made threats against his life. Fearing for his life, the plaintiff alleges that he informed his unit counselor that he had reason to believe that he was in imminent danger if he remained in the same cell, or even the same unit with X. The plaintiff maintains that the unit manager, Chris Greiner, was informed and ordered an emergency move of the plaintiff to another unit. However, on March 16, 2007, the plaintiff maintains he was forced to move back to his original cell with X despite telling Greiner that he felt his life would be in danger. The plaintiff also maintains that he told the operations lieutenant, Vince Clements, of his safety concerns. The plaintiff alleges that

---

[1] On June 12, 2007, the plaintiff was transferred from USP Hazelton to USP Big Sandy, Kentucky. Thereafter, he was transferred to FCI Gilmore, where he is being held in segregation pending transfer to a new institution. (Doc. 32-1, p. 2).

Clements made some calls and then ordered the plaintiff to move to the cell with X. The plaintiff indicates that he complied with the direct order but a few days later gave Warden Martinez a BP-9 in which he again indicated his concerns for his safety and asked to be placed in the Special Housing Unit ("SHU") on protective custody status. In response, the plaintiff indicates that Warden Martinez told him there was not room in the SHU, but stated "[g]ive me 18 months clear conduct and I will ship you." (Doc. 1, p.4). Finally, the plaintiff alleges that although he tried his best to get along with X, on April 11, 2007, X raped him in the cell. As relief, the plaintiff seeks $100,000 in damages from each of the three defendants.

### III. **Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment**

In support of their Motions, the defendants allege that:

1. The plaintiff's Eighth Amendment claim must be dismissed because the defendants did not fail to protect the plaintiff from harm;

2. The plaintiff's allegations of retaliation by the defendants is baseless and must be dismissed;

3. The defendants are entitled to qualified immunity.

### IV. **Plaintiff's Response**

In response to the defendants' Motion to Dismiss, or in the alternative, for Summary Judgment, the plaintiff repeats the factual scenario he outlined in his complaint and adds additional detail. He then argues that there is a genuine issue of material fact such that the defendants' motions should be denied.

### V. **Standard of Review**

### A. **Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly,

it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th

4

Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

B. **Summary Judgment**

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the

5

"party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

## VI. ANALYSIS

### A. Cruel and Unusual Punishment

Like all prisoners, the plaintiff has no constitutional right to be held in protective custody. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994)(citing Hewitt v. Helms, 459 U.S. 460, 468 (1983); O'Bar v. Pinion, 953 F.2d 74, 83 (4th Cir. 1991))("[A]dministrative segregation and reclassification...are ...discretionary administrative acts in which an inmate obtains no liberty interest"). However, the Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

The Eighth Amendment clearly imposes a duty on prison officials "to protect prisoners from

6

violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm, and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

In support of their Motion to Dismiss, or in the Alternative, for Summary Judgment, the defendants have submitted a number of Declarations to establish that they did know that inmate X posed a substantial risk of serious harm to the plaintiff. The first declaration is from Kevin Littlejohn, the Administrative Remedy Clerk at the Mid-Atlantic Regional Office of the BOP. Littlejohn indicates that he reviewed the SENTRY Administrative Remedy Generalized Retrieval records and determined that the plaintiff did not file any administrative remedies claiming that he was assaulted by a cell mate on February 7, 2007. (Doc. 32-1, p. 2).

The second Declaration is from Christopher Greiner, who was a unit manager at USP Hazelton from September 19, 2004, until September 19, 2007. Greiner indicates that he recalls the plaintiff

7

approaching him twice about his cell mate. Greiner alleges that the first time, the plaintiff specifically requested to room with inmate X. The second time was to indicate that he no longer wished to room with inmate X. However, Greiner indicates that when asked whether he had safety concerns, the plaintiff denied their being any. Accordingly, Greiner alleges that he referred the plaintiff to his unit counselor because as unit manager, he was not generally involved in the movement of inmates between cells. Furthermore, Greiner specifically denied that he ordered an "emergency move" on February 7, 2007. Greiner goes on to explain that if inmates need to be separated due to safety issues, either one or both of the inmates would have been taken into protective custody and placed in the SHU until an investigation could be done regarding whether there was an actual threat to the inmate's safety. Greiner continues by noting that just moving an inmate into another unit, without removing him from general population, would not ensure his safety because inmates also come into contact during outside recreation, meals, or work. Because the SENTRY report shows that neither the plaintiff nor inmate X were placed in the SHU between February 7 and March 16, 2007, this would indicate to him that neither inmate was known to have any problems with other inmates during this time. Greiner then indicates that he does not know why the plaintiff was placed back in the cell with inmate X on March 16, 2007, but denied that the plaintiff informed him that he was in imminent danger if moved back into the cell, or that he told him that he had "informed" on inmate X. (Doc. 32-2, pp. 2-3).

The third declaration is from Bryan Antonelli, who was the Supervisory Investigative Agent ("SIA") at USP Hazelton during the period relevant to the complaint. Antonelli indicates that as an SIA, he was the designated intelligence officer at USP Hazelton and was responsible for collecting, analyzing and disseminating strategic intelligence as it relates to inmates or groups of inmates whose activities pose a threat to the security of the institution, the safety of staff and inmates, and the welfare

of the surrounding community. In addition, Antonelli indicates that was also responsible for conducting investigations involving assaults between inmates. Accordingly, on April 11, 2007, he was informed that the plaintiff had made a statement to the Chaplain that he had been sexually assaulted by his cell mate, inmate X. Antonelli further indicates that the inmates were separated, and the plaintiff was taken to Health Services for an examination. Although no noticeable injuries were found, he was referred to Mon General Hospital in Morgantown, West Virginia, for examination and rape protocol. At the hospital, the plaintiff told the physician that inmate X wanted to have sex with him but that he refused. He then stated that inmate X had a knife, threatened his life, and had anal sex with him. The plaintiff stated that he did not struggle because inmate X had a knife. At the hospital a rape kit procedure was performed. The plaintiff was then returned to USP Hazelton and placed in the SHU pending investigation into his allegations. Antonelli notes that although the plaintiff alleged that he was threatened with a knife, no knife was found on inmate X or in his cell. Furthermore, with respect to any DNA evidence, Antonelli acknowledges that due to an oversight, the rape kit was not forwarded to the state criminal laboratory, and therefore, the swabs were never tested for DNA. However, Antonelli then opines that because the plaintiff has acknowledged that he is a known homosexual,[2] and inmate X claims that the plaintiff was his "wife, girlfriend", evidence of inmate X's DNA would not have been conclusive regarding a forced rape.

The fourth Declaration is from Sherry Slone, who is a Registered Nurse and the Health Services Administrator at USP Big Sandy in Inez, Kentucky. As the Health Services Administrator, Slone has access to inmates' medical records. Sloan indicates she reviewed the plaintiff's medical records, and

---

[2]In a previous civil rights case filed with this Court, the plaintiff referred to himself as an "unmarried" homosexual. See 1:06cv177.

9

there were no records that show that he reported an assault, or was treated for any assault on or around February 27, 2007. Sloan further indicates that the only assault reported by the plaintiff while he was housed at USP Hazelton was that on April 11, 2007. (Doc. 32-4, p. 1).

The fifth Declaration is from Vincent Clements, who was an Operations Lieutenant at USP Hazelton at the time relevant to this complaint. In that position, Clements was responsible for maintaining the security of the institution, as well as managing the care and custody of the inmate population. He was also responsible for the enforcement of all rules and regulations relative to custodial security at the institution. Clements acknowledges that the plaintiff claims that he informed him that inmate X was a danger to him, but that he nevertheless gave him a direct order to room with inmate X. Although Clements does not recall this situation or incident, he denies the allegations. Clements notes that if an inmate approaches him and tells him they he is in danger from another inmate, he immediately separates the inmates until an investigation can be made. Accordingly, he states that he would not ignore an inmate who told him that he was in imminent danger. (Doc. 32-5).

The sixth Declaration is from Ricardo Martinez, who was the warden at USP Hazelton from March 11, 2007 to June 11, 2007. Although he remembers the plaintiff, Martinez denies that the plaintiff informed him that he was in danger from his cell mate. Martinez maintains that had the plaintiff done so, he would have immediately contacted SIS or a lieutenant to meet with the plaintiff and start and investigation into whether protective custody was necessary. In addition, Martinez indicates that he does not remember the plaintiff handing him an administrative remedy. However, he acknowledges that occasionally he would accept administrative remedies directly from inmates. However, when this happened, he would pass it on to the executive assistant or administrative remedy clerk so that it could be properly logged and investigated. Accordingly, Martinez maintains that if the

plaintiff handed him an administrative remedy, he would have given it to the executive assistant or administrative remedy clerk for investigation.(Doc. 32-6).

The seventh Declaration is from Tammy Titchenell, who was the Administrative Remedy Clerk at USP Hazelton between February 2007 and May 2008. Titchenell outlines her duties as the Administrative Remedy Clerk. She then notes that she reviewed administrative remedy request form number 449373-F1, which was submitted by the plaintiff at the institutional level. She further notes that the request form is dated stamped April 16, 2007, which would have been the day she received it in her office. She also states the there is a typewritten note stating: "original administrative remedy form lost." She continues by noting that besides date stamping the form, she would make a copy of the form for the institution's files. She notes that she typed the note on the form because the original form could not be found. However, the copy already had the date stamp on it, indicating that April 16, 2007, was the day the original form was received in her office.[3] (Doc. 32-7).

The seventh and final Declaration is from Donald Petrisko, who is the current SIA at USP Hazelton. In that position, Petrisko has access to the official records compiled and maintained by the BOP. According to Petrisko, when an inmate claims he was assaulted by another inmate, or when there is evidence that an inmate was assaulted, an investigation is opened. The investigation includes

---

[3]Although the defendants did not provide the Court with a copy of this administrative remedy, the plaintiff attached a copy with his complaint. In it, he complains that he had a violent altercation with inmate X on February 7, 2007. He further states that Unit Manager Griner [sic] initiated an emergency move. However on March 16, 2007, he was moved back in with inmate X. The plaintiff continues that he went to see the operations lieutenant (Clements) to try and contest the move. However, Clements refused to intervene. The plaintiff concludes by alleging that staff is deliberately and maliciously putting his life in danger to retaliate against him for initiating litigation. (Doc. 1-1, p. 1). The plaintiff's administrative remedy is not dated, and therefore, it is impossible to discern whether it was prepared before or after April 11, 2007, the date he alleges he was raped.

speaking with the alleged victim, the alleged perpetrator, reviewing cameras, and speaking with potential witnesses. Investigations are given a number and placed in a computer database called Quatro Pro. Petrisko concludes his Declaration by stating that only one investigation in this database involves the plaintiff and inmate X. This investigation was done in response to the plaintiff's allegation that he was sexually assaulted on April 11, 2007. (Doc. 32-8).

As previously noted, "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, supra at 837. Clearly, the complaint, viewed in the light most favorable to the plaintiff is sufficient to survive the defendant's motion to dismiss. It give the defendants' fair notice of his claims, and the grounds upon which it rests.

Furthermore, with respect to the defendants' motion for summary judgment, it is clear that there are genuine issues as to materials facts, such that a grant of summary judgment at this early stage in the proceedings would be inappropriate. The defendants argue that there is no evidence to support a finding that they either knew of, or disregarded a risk to the plaintiff's health or safety. Their argument rests on their assertion that the plaintiff never reported an assault by inmate X prior to the alleged rape. In support of their argument, they have submitted Declarations, as set forth above that tend to show that the plaintiff: (1) never filed an administrative grievance regarding a prior assault; (2) never sought medical treatment for a prior assault; (3) never would have been moved to another cell without first being placed in the SHU pending an investigation; and (4) must not have advised staff of his concerns because staff would have investigated his allegations.

However, in his response to the defendants' motions, the plaintiff sets forth specific factual allegations that contradict those Declarations.[4] In particular, it is pertinent to note that, although the plaintiff cannot remember the name of his unit counselor, he indicates clearly that Unit Manager Greiner was home sick on February 7, 2007, when he was moved out of the cell with inmate X.[5] Moreover, he sets forth in detail the alleged conversation he overheard between the unit counsel and Greiner which, as recited, establishes that he was moved for safety reasons without first being placed in the SHU. (Doc. 49, pp. 21-22). In addition, in acknowledging that he did not seek medical attention for the injuries he alleges he sustained on February 2, 2007, the plaintiff notes that did not require medical attention and did not want to risk being sent to the SHU pending an investigation into the assault. He also acknowledges that he did not file a grievance regarding the alleged assault on February 2, 2007. However, he offers a reasonable explanation, by noting that his request to be moved was granted, and therefore, he had neither a reason nor ground upon which to file a grievance. The plaintiff is also very clear in his explanation of how he came to be moved back into the same cell with inmate X. Specifically, he notes that following his move on February 7, 2007, he was eventually housed in a unit reserved for UNICOR workers because he was on the waiting list for UNICOR. However, he was removed from the list, and therefore, he was sent back to Unit A and housed with inmate X, because Greiner allegedly indicated that no other inmate in Unit A wanted to live with him. The plaintiff also expounds on his efforts to convey to both Greiner, Clements, and Martinez the danger he

---

[4]The undersigned recognizes that the plaintiff has not submitted any "evidence" to contradict the Declarations submitted by the defendants. However, no discovery has yet been permitted in this case, and it reasonable to assume that the evidence that would support his response is in the control of the defendants.

[5]Although the plaintiff mentioned the unit counselor in his complaint, the defendants did not, for whatever reason, supply a Declaration from that individual.

faced if housed with inmate X. Finally, the undersigned finds troubling the defendants' failure to have the rape kit analyzed. Although they maintain that the plaintiff and inmate X were in a "relationship" and therefore, even if DNA was present it would not establish that the plaintiff had been raped, they offer no evidence of this relationship other than the rather self serving written statement by inmate X that was given as part of the investigation that followed the alleged rape. (Doc. 32-3. pp. 33-34). Furthermore, had the rape kit been analyzed, and no DNA was found, proof would exist that no rape had occurred.

It appears clear to the undersigned that the merits of the plaintiff's complaint revolve around his undisputed move from his assignment in A02 on February 7, 2007 and his subsequent return to that assignment on March 16, 2007, and whether he was raped on April 11, 2007. For the reasons stated above, it is clear that there are genuine issues of fact left to be resolved, and accordingly, summary judgment is not appropriate and this time.

**B. Retaliation**

In order to sustain a claim based on retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 Fl3d 72, 75 (4th Cir. 1994). Therefore, "in forma pauperis plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B)]." Id. Furthermore, claims of retaliation are treated with skepticism in the prison context. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996).

In his complaint, the plaintiff makes a single conclusory statement that "this situation was

designed in retaliation for my litigation against top prison officials." (Doc. 1, p.5). It is true that the plaintiff filed a civil rights complaint against six officials at USP Hazelton on December 11, 2006. However, the plaintiff has provided no specific facts to support his claim of retaliation. Accordingly, the same should be dismissed.

**C. Qualified Immunity**

Qualified immunity is an affirmative defense. Bryant v. Muth, 994 F. 2d 1082, 1086 (4th Cir.), cert. denied, 510 U.S. 996 (1993). With regard to qualified immunity, the United States Supreme Court has provided that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitgerald, 457 U.S. 800, 818 (1982); Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). Discretionary functions include actions that were "undertaken pursuant to the performance of [the defendant's] duties and [were] within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994). For example, the serving of an arrest warrant is a discretionary function. See Miceli v. Apuzzo, 1999 WL 33117077 (D. Me. 1999).

To determine whether qualified immunity exists, the court must first determine whether a constitutional or statutory right was deprived, then determine whether the right was clearly established at the time of the violation and whether a reasonable person in the defendant's position would have understood that his actions violated that right. Saucier v. Katz, 533 U.S. 194 (2001); Doe v. Broderick, 225 F. 3d 440, 454-455 (4th Cir. 2000). "Clearly established" does not refer to a general principle of law. Anderson v. Creighton, 483 U.S. 635, 639 (1987). Instead, "[t]he

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. at 640 (internal citations omitted). Further, the defendants' actions as alleged in the complaint are examined for "objective legal reasonableness." Behrens v. Pelletier, 516 U.S. 299, 309 (1996).

While decisions regarding inmate cell assignments are the type of day-to-day judgments that rest firmly in the discretion of prison officials[6], that discretion is tempered by the plaintiff's firmly established right to be protected from violence at the hands of other prisoners. Taken in a light most favorable to the plaintiff, the defendants are not entitled to qualified immunity because a reasonable BOP official would recognize that placing the plaintiff with a cell mate, who had previously assaulted him, posed a significant risk of harm.

## VI. RECOMMENDATION

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion to Dismiss, on in the Alternative, for Summary Judgment be **GRANTED** with respect to the plaintiff's claims regarding retaliation and be **DENIED** with respect the plaintiff's claim that his Eighth Amendment rights were violated and that the defendants are entitled to qualified immunity. In addition, the undersigned recommends that the Court issue a scheduling Order to address the issue of an alleged violation of he plaintiff's Eighth Amendment rights.

Within fourteen (14) days after being served with a copy of this report and recommendation,

---

[6]Veney v. Weche, 293 F.3d 726, 733 (4th Cir. 2002).

any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp. Jr., United States District Court. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk is further directed to provide a copy of this Report and Recommendation to any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: December 10, 2009

                                                /s/ James E. Seibert
                                                JAMES E. SEIBERT
                                                UNITED STATES MAGISTRATE JUDGE